13CV6276
Judge Grady
Mag. Judge Mason

1    Barbara Robbins, Chicago, IL, pro se

2

3    BARBARA A. ROBBINS,

4                     Plaintiff,

**United States District Court**
**Northern District of Illinois**

5            v.

6    DEPAUL UNIVERSITY,

RECEIVED

7                 Defendant.

SEP X 3 2013

8

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

9

10    **Introduction**

11      Barbara Robbins (Robbins) a 59-year-old, former student of DePaul University (DePaul)

12   charges that DePaul discriminated against her based on her race (African American) by subjecting

13   her to a systemic hostile- learning- environment and a hostile- student-workplace between 2008 thru

14   2011.

15      Robbins also contends that DePaul retaliated against her for making discrimination

16   complaints to university officials including the following persons in 2009, 2010 and 2011: 1)

17   DePaul's President 2) Vice President(s) of Institutional Diversity and Equity 3) Director of Student

18   Employment 4) Dean (s) of the School of New Learning 5) Assistant Dean of Students 6) DePaul

19   Ombudsman.  And that DePaul administrators and professors acted with deliberate indifference to

20   known acts of harassment towards Robbins in its programs and activities.

21

22

23

24                                      1

Finally, Robbins charges that DePaul retaliated against her because she filed complaints against DePaul with the U.S. Department of Education – Office of Civil Rights (OCR) in 2011. And because Robbins protested, DePaul violated the Family Educational Rights and Privacy Act (FERPA) by not granting Robbins access to her academic and financial aid records in 2012.

**Background Facts**

In April 2011, Robbins filed a complaint against DePaul with the OCR. The OCR made final determinations on the case in July 2011 and December 2011 respectfully. Robbins filed an appeal to the decisions with the OCR Deputy Assistant Secretary for Enforcement in Washington DC in September 2011 and February 2012. The OCR made final determinations on those appeals in June 2013.

Robbins withdrew from DePaul in June 1011, without completing the final three courses in her program, or receiving her BA degree because of continued harassment by DePaul, after she filed the OCR complaint and illness brought on by discrimination at DePaul between 2008 and 2011 as follows:

**Claims of Discrimination and FERPA Violations**

1) In 2008, DePaul Professor Michael Boruch emailed Robbins a photo captioned "Who is the fairest of them all? Snow White you Black Bitch and don't you ever forget it".

2) In 2008, DePaul Professor Michael Boruch emailed Robbins an audio link unrelated to the course work on vitamin D deficiency and skin color.

3) In 2009, Academic Mentor, Fred Wellisch returned a properly cited written assignment to Robbins warning her to "use your own words, in your own way" suggesting that Robbins violated plagiarism rules.

4) In 2009, Associated Dean, Susan Reed denied Robbins requests to replace Wellisch as her Academic Mentor because Robbins found the relationship "unhealthy".

5) In 2009, Robbins successfully completed all requirements to advance to the "First Committee Meeting" milestone in her degree program. However, her Academic Advisor, Fred Wellisch cancelled the meeting, and required Robbins to go through an unknown qualification of a "Pre First Committee Meeting".

6) In 2009, Robbins worked as a student worker in DePaul's School of Education (SOE) where she was subjected mocking, racial slurs, and prank calls, conducted by DePaul employee Sandra Tanksly, and other SOE employees, as well as, retaliation for reporting these incidents. These events caused Robbins to quit at the recommendation of a psychologist that she consulted about the distress the situation caused her.

7) In 2010, Robbins' white classmate, Dianna Demski shouted profanities at Robbins during a conference in front of their tutor in the DePaul Writing Center. Their Professor Miriam Ben-Yoseph did not enforce disciplinary action against Demski per DePaul policy.

8) In 2010, Professor Miriam Ben-Yoseph issued Robbins an incomplete grade for her Global Environment course even though Robbins completed every assignment on time.

9) In 2010 early in the quarter, Robbins contacted Professor Matthew Sorenson several times requesting clarification on his instructions for a class project and the course syllabus. Sorenson did not give Robbins feedback until after the quarter ended. And after he had issued Robbins final grade ( B )with a notation that Robbins should have done a better job on her class project.

10) In 2010, Robbins told Professor Matthew Sorenson that her team leader Tonya Beall moved the team discussion board in his online course. Beall created a new discussion board without notifying Robbins, which barred Robbins from participating with the team. Sorenson informed Robbins that Beall's actions were "allowable ".

11) In 2010, Robbins advised Professor Matthew Sorenson that her classmate Tonya Beall posted sarcastic messages critical of Robbins on a public online discussion boards. Robbins Sorenson said he did not see Beall's comments that were clearly visible.

12) In 2010, Robbins told DePaul's Assistant Dean of Students, Art Munin that she received unwanted email communications from Tonya Beall six months after the class ended, as well as from

4

1   Dianna Demski nearly a year after their class ended. Munin informed Robbins that he could not hold

2   the students accountable.

3

4        13) In 2010, Robbins' Academic Advisor, Fred Wellisch told her that he would not approve

5   her Advanced Project Proposal even though Robbins met all of the academic requirements to move

6   forward with it.  Wellisch informed Robbins that she had to complete ten reports, which were not

7   required perquisites for the Advanced Project Course.

8

9        14) In 2010 , DePaul's Assistant Vice President of Diversity, Barbara Schaffer failed  to

10  advise Robbins on how to file a complaint with the her office regarding allegations of racial

11  discrimination  that Robbins reported to DePaul's President.  Schaffer diminished Robbins

12  discrimination complaint to dislike of her and aborted her promise to follow-up with Robbins,

13  saying, "Sorry I didn't call, something came up" and scheduled another meeting with Robbins that

14  went nowhere.

15

16       15) In 2010, Professor Howard Jeffery, Robbins Service Externship instructor subject her to

17  a credit check by assigning to a small non-profit organization , which required that Robbins, an

18  unpaid student-volunteer,  to submit to a massive back ground check . Jeffery did not give Robbins

19  prior notification of these unusual course qualifications.

20

21

22

23

24                                           5

16) In 2010, Professor Howard Jeffery, subjected Robbins to an exercise that required Robbins to give her reaction to a racial slur: "Welfare Queen" and subjected Robbins to racially explicit comments by her classmates.

17) In 2011, Associate Dean, Susan Reed did not notify Robbins of the cancellation of a course on Slavery that Robbins enrolled in even though Reed knew the course would not be offered.

18) In 2011, Robbins reported to her new academic advisor, Gretchen Wilbur about numerous administrative errors on her academic transcript, which caused her GPA to drop from 3.3 to 3.0. to 2.66. Robbins asked Wilbur to recalculate her GPA. However, Wilbur gave Robbins instructions on how to do it herself that were incomplete or vague.

19) In 2011, Robbins contacted Associate Dean Susan Reed about the administrative errors on her transcripts that caused her GPA to plummet from 3.3 to 2.66. Reed told Robbins the errors would remain on her unofficial transcript permanently. Reed did not recalculate Robbins GPA and update it on her official transcript until after Robbins had withdrawn from DePaul.

6

20)  In 2012, Suzi Wachowski, Associate Student Records violated FERPA rules by refusing to honor  Robbins written request to review her academic records and other documents. In addition, DePaul blocked Robbins 2012 financial aid records making them unavailable for her to view.

**Civil Rights Violations**

Title VI of the Civil Rights Act of 1964 (Title VI) , 42 U.S.C.  2000d implementing regulation at 34 C.F.R.  100.3 (a), states that not individual may be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination on the basis of race or national orgin under any program or activity that receives Federal financial assistance.

Title VI implementing regulation at 34 C.F.R.  100.3 (b) (1) (i) prohibits a recipient, on the basis of race or national origin, from denying an individual any service, financial aid, or other benefit provided under the program.

The title VI  implementing regulation at 34. C.F.R.  100.3 (b) (1) (ii) prohibits a recipient, on the basis of race or national origin, from providing any service or other benefit to a student that is different, or is provided in a different manner, from that provided to other students.

The Title VI implementing regulation at 34 C.F.R. 100.7(e), prohibits a recipient from intimidating or retaliating against an individual for the purpose of interfering with any right or privilege secured by Title VI or because the individual has made a complaint or participated in any manner in an investigation or proceed under the regulation.

7

Then on November 2, 2008, Boruch sent Robbins an audio links of radio shows on vitamin D deficiency and skin color saying "I heard an interesting piece yesterday morning driving down to the Loop..... You may want to hear them" .This topic had nothing whatsoever with Robbins photography class assignments or studies.

Robbins felt that the photo Boruch sent her a photo of an African American woman looking in a mirror with Snow White calling her a "Black Bitch", and telling the Black woman that she was not as beautiful as Snow White was a horribly offensive message that Boruch wanted to communicate to Robbins about African American women. Additionally, Boruch discouraged Robbins from going forth with her self-portrait project, saying in an email, "I worry that it may be too personal for class presentation", but encouraged Robbins to look at another student's photo collection *The Ladies of Quincy Grove* of white women.

On another occasion, Boruch asked students who needed help with their photo project to stay after class, when the other students left, Boruch mentioned to Robbins that another student (white) in the class had plagiarized a photo of the Picasso sculpture at the Illinois State Building. He put it up on the screen for Robbins to see. Nevertheless, he said" she 's a model (white) and lives on Astor Street", Boruch implied that he would not do anything about it.

When Boruch sent the second email about skin color, Robbins knew he had a problem with her dark-skinned-complexion, and that Boruch was harassing and sending her insulting graphics, media because she is African American. However, Robbins did not say anything to anyone about the emails and conversations with Boruch. As a new student at DePaul, she decided not to make any waves.

8

However, Robbins, a student with a 4.0 GPA, started skipping classes, making excuses or working to get out of attending the class. Boruch emailed her saying "we missed you in class" However, Robbins became very discouraged, loss interest in the photography class, fell behind on her assignments, and canceled plans of taking additional photography courses at DePaul, which would have been very useful to her as a liberal arts major.

**3) In 2009, Academic Mentor, Fred Wellisch returned a properly cited written assignment to Robbins warning her to "use your own words, in your own way" suggesting that Robbins violated plagiarism rules.**

On March 9, 2009, Fred Wellisch, Robbins' Academic Advisor suggested that Robbins plagiarized a portion of her Professional Goals and Action Plan. Wellisch wrote, "Make sure, even though you cited Whalen that you are expressing this in your own way and in your own words".

Robbins wrote about an interview that she conducted with Patricia Whalen, Director of the Graduate School of Communications at DePaul. Robbins provided Wellisch with a detailed annotated bibliography, and Whalen's personal contact information for verification of her exact words. However, Wellisch would not retract his assumption that Robbins did not craft the document with her own words, saying he only regretted that Robbins got upset about his comments.

Robbins spent most of the quarter developing her Professional Goals and Action Plan. This document served as a tool to help her navigate through a complex degree program and stay on track with her career objectives. In addition, Wellisch regarded it as a key part of Robbins 'Foundations Portfolio, and a requirement to pass his course.

However, Wellisch restricted his assessment of Robbins' plan to comments about plagiarism and minor grammar errors such as "unnecessary comma", "check you're spelling", and "is this an extra word". The only substantive feedbacks that Wellisch provided were complimentary of Whalen's comments; Wellisch did not provide any guidance, direction, information or motivation to Robbins, his mentee, which helped her to assess her progress with her degree. Robbins wondered if she properly determined her goals, learning objectives and delivered the right outcome. Because she had so many unanswered questions.

Robbins felt frustrated and overwhelmed . Wellisch lack of confidence in her academic integrity or writing abilities were humiliating to Robbins. Moreover, she realized that due to his sparse feedback, he had little interest in mentoring her through her degree program And as a result, she felt uncomfortable asking for his assistance with her work.

Wellisch only seemed interested with policing Robbins' academic violations, which constitute grounds for dismissal. And given that the student demographics for remedial writing class i.e. *Writing Workshop* in the School of New Learning in 2009 were 98% African American, Robbins believed that Wellisch made an assumption based on Robbins race that she did not have the capabilities to write in accordance with the academic standards of the school. Therefore, anything that Robbins wrote that did not coincide with stereotypical Black dialect and prose; Wellisch cited it as possible plagiarism.

**4) In 2009, Associated Dean, Susan Reed denied Robbins requests to replace Wellisch as her Academic Mentor because Robbins found the relationship "unhealthy".**

On March 12, 2009, Robbins wrote the Dean of the School of New Learning, Marisa Alicea and requested a new Advisor because of the aforementioned problems with Wellisch. Alicea referred the matter to Associate Dean, Susan Reed. She immediately denied the request without talking to Robbins. On March 12, 2009, Reed emailed Robbins saying that Wellisch advised her " he did apologize....you're doing very well in Foundations...because you have made such progress and in order to avoid slowing down your progress, I'm going to ask you to continue working with Fred". Robbins asked for an appeal of the decision. But Reed wrote, "...there isn't an appeal process..Fred has been very successful at helping students to get through the program and achieve their goal of receiving degrees...Please contact Fred to discuss some way of resolving your differences". However, Reed did not offer Robbins any guidance on how to solve the differences.

Reed reported back to Wellisch on March 15, 2008 saying " I let Barbara know that it seemed best for her to continue to work with you.....She strongly disagreed .... Because you have "caused her a lot of stress"...I'm guessing that she's causing herself a lot of stress...". Wellisch replied "Thank you ..."

Robbins felt that Reed's decision created a hostile learning environment for her because Wellisch would continue to scrutinize her writings with racial bias and avoid teaching her anything of value. And that Reed's decision was retaliatory, and heavily influenced by Wellisch because Robbins complained to the Dean that her relationship with Wellisch was "unhealthy".

**5) In 2009, Robbins successfully completed all requirements to advance to the "First Committee Meeting" milestone in her degree program. However, her Academic Advisor, Fred Wellisch cancelled the meeting, and required Robbins to go through an unknown qualification of a "Pre First Committee Meeting".**

On March 12, 2009, Associate Dean, Susan Reed emailed Robbins saying that according to Wellisch "your First Committee meeting is scheduled for next month...you only have tweaking left to do on your work for Foundations in order to pass the class". Accordingly, Robbins did successfully complete the course at the quarter end in March 2009 and she advanced with her cohorts to the First Committee Meeting.

However, on April 1, 2009, Wellisch emailed Robbins saying he wanted to cancel her First Committee Meeting because of corrections that she needed to make on work she did for the Foundations class that Robbins completed and passed. And he wanted to discuss possible changes to her learning plan that Robbins also submitted during the class. Wellisch sent Robbins the following list "Now here are a few specific things I noticed that need correcting ".

Wellisch also emailed, "So what I am suggesting is that we use the time on the 23rd – since it is already set aside – for our pre- first committee meeting.... So let's just cancel the first committee meeting for that date and time. We'll have our pre-first committee meeting instead and then reschedule the first committee meeting for a later date. See you then".

Robbins replied to Wellisch that she was "oblivious "to this pre-meeting requirement.  And this new and sudden development would inconvenience her Professional Advisor, Doris Palmer who lived sixty miles away. Robbins had confirmed all of the participants and arrangements for the meeting as part of her Foundations course work.   Robbins read the entire Foundations Student Handbook and found no mention of a "pre-meeting "requirement.  She also asked other students but, no one had ever heard of it or been asked to comply. In addition, Wellisch did not list a "pre-meeting it in the course syllabus, mention it to her during the class, or advise Robbins that she need to make specific improvement in her work prior to the First Committee Meeting.  In fact, again, Wellisch told the Associate Dean, Susan Reed that Robbins only need to tweak a few things to pass the class.

Robbins thought that Wellisch deliberately withheld important academic information from Robbins that could have helped her to develop a better Foundations Portfolio, until after she completed his course, in retaliation for Robbins reporting his plagiarism charge to the Dean.  As a result, Robbins had to seek counsel outside of DePaul from her Professional Advisor, Doris Palmer, CEO a non-profit organization. Ms. Palmer found holes in Robbins Foundations class work, pointed them out, and volunteered to assist Robbins to complete her studies.  This is in addition to agreeing to become her Professional Advisor that works with Wellisch on the First Meeting Committee for a small honorarium (that DePaul never paid her).

Lastly, Wellisch never provided Robbins with any additional assistance and he kept cancelling the "pre-meeting". In fact, he made things more difficult for Robbins, by entering error messages on her electronic plan, and then requesting that she correct them and provide "clean copies". After, much complaining by Robbins, Wellisch finally allowed the First Committee

13

Meeting; however, Robbins did receive any feedback from Wellisch for over eighteen months, other than vacation notices or minor administrative paperwork changes. Robbins made her own academic plans, scheduled her own classes, and essentially acted as her own advisor the best she could, as she felt extremely uncomfortable with Wellisch bias editing of her writing, lack of direction, and retaliation towards her.

**In 2009, Robbins worked as a student worker in DePaul's School of Education (SOE) where she was subjected mocking, racial slurs, and prank calls, conducted by DePaul employee Sandra Tanksly, and other SOE employees, as well as, retaliation for reporting these incidents. These events caused Robbins to quit at the recommendation of a psychologist that she consulted about the distress the situation caused her.**

In May 2009, Robbins notified her supervisor, Alexa Walsh in DePaul's School of Education of racial innuendoes, mocking, close monitoring of her job performance as a student receptionist by Sandra Tanksly and other SOE employees who were not her supervisor. On June 10, 2009, Robbins reported incidents to the Vice President of DePaul's Office of Institutional Diversity, Emily Opalski as follows : 1)Robbins supervisor Alexa Walsh asked Tanksly to give Robbins an unusually large task-involving making almost 200 data entries 2) the other SOE student (white) receptionist was given much smaller and simpler tasks to the point she often had nothing to do but put on her headphones and listen to music 3) these attacks were retaliatory because Robbins is African American 4) Sandra Tanksly complained to Robbins daily that she was not doing a good job, and did not know how to do her job as a part-time student receptionist. Told Robbins that the white student receptionist did her job perfectly. Robbins, a former business owner who employed 150 employees

14

including a team of 24-hour receptionists ignored Tanksly. Tanksly would become infuriated and mocked Robbins, made derogatory comments, prank calls and racial jokes. Robbins had not received any criticism of her work from supervisors. In fact they praised Robbins for developing a survey and sending it to SEO administrators to determine exactly how they wanted Robbins to answer their phones and greet their guests and then implementing those preferences. However, Tanksly told Alexa Walsh that Robbins was incompetent, and that Robbins asked Tanksly so many questions about the receptionist job that she fell behind with her duties in her newly promoted position as a secretary. Walsh asked Robbins to direct any questions to her instead of Tanksly.

On June 12, 2009, Robbins confirmed with the Director of Student Employment, Erick Friedman that she should not report to work for the remainder of the week due to hostilities toward her in the SOE office. Earlier that week Robbins had told Friedman that the prank phone calls and mocking had gotten so severe that she no longer felt physically safe in the office.

Robbins notified numerous other DePaul officials between April 2009 and June 2009 that she was being harassed with racial slurs, prank calls, and mocking of her by co-workers and students in SOE. The notified officials included : Donna Washington, Director of Human Services, Craig Mousin, DePaul Ombudsperson, Jay Jones, Office of Diversity, and she even called the Employee Hot Line requesting immediate help. What transpired from the complaints were three meetings with Alexa Walsh, the Ombudsperson, and Tanksly. Walsh and the Ombudsperson asked Tanksly to be more welcoming towards Robbins.

However, the severity and frequency of the prank calls from her co-workers increased after the meetings Tanksly and SEO staff mocked of her by 1) making faces at her 2) closing the main

15

doors of the office and then making racial jokes by Robbins desk 3) calling Robbins from their offices with disguised voices all day long 4) they made fun of the way she answered the phones.

On May 4, 2009 Sandra Tanksly and another co worker came out of their office and assembled very close to Robbins desk. Tanksly said "did you get my email ? "Yes, I really like the watermelon one". They then laughed hard and then returned to their offices.

Robbins interrupted the combination of the laughing and watermelon comments as a derogatory joke about Black people and watermelons and reported to Alexa Walsh about the watermelon email circulating around the office. An investigation by the Office of Diversity turned up an email from Tanksly which she sent to SOE Academic Advisors inclusive of the Director of Teaching, Kathleen Liston who supervised Robbins with Walsh. DePaul informed the OCR that Tanksly's email contained "numerous photographs of various fruits including bananas, tomatoes, watermelons, oranges etc" And that Robbins was not copied on the email, nor did it contain racial slurs".

However, Robbins contends that Tanksly deliberately intended for Robbins to hear the words watermelon, she said it with malice, and meant it to be derogatory toward Robbins because she is African American. Tanksly had made other racial jokes starting from Robbins first day of employment until she got caught with the aforementioned email.

DePaul failed to mention to the OCR that Tanksly sent the email to another student worker (white) and the student was reprimanded by DePaul's Office of Diversity for using, derogatory insulting, and language to describe people with disabilities after viewing Tanksly email, and replying to Tanksly to the pictures with such comments on Tanksly's watermelon email thread on company time and computers. (Robbins is disabled). DePaul found this to be particularly disturbing because

1   the student worker who made the comments was a graduate student, seeking a Master Degree in

2   Special Education from the School of Education at DePaul.   And Robbins reported this particular

3   student worker to her supervisor, Alexa Walsh as one of the people who harassed her regularly.

4        During the week of June 22, 2009, Doris Palmer, Robbins Professional Advisor noticed that

5   Robbins seemed emotionally stressed out about the incidents at DePaul.  Palmer a professional

6   social worker recommended that Robbins seek professional help from a psychologist.   On June 23,

7   2009 Robbins met with a psychologist for the first time in her life.  She consulted with Psychologist

8   Linda Whittaker and through Whittaker's intervention Robbins realized that continuing to work at

9   DePaul would be detrimental to her emotional health and she quit.

10       Whittaker noted " I met with Barbara on June 23, 2009 for 90 minutes.  Barbara shared

11  she....had secured a work study position in the School of Education ...she had been on the job for

12  three months and had experienced significant harassment during work hours.  She shared a number

13  of examples.  Barbara went on to say she had taken action steps with her supervisor and other to

14  resolve the situation but to no avail.  Barbara was clearly under a great deal of stress....I ..encouraged

15  her to seek continued support and problem solving for the difficult situation she found herself in".

16       Robbins sent a letter of resignation to Alexa Walsh, stating : " I was to return to work today,

17  Wednesday, June 24.  However, the mocking, racial slurs, and prank calls, conducted by Sandra

18  Tanksly, and other SOE employees, as well as, the subsequent retaliation for reporting these

19  incidents, is too much for me to bear.  I have not experienced dignity in the work place at DePaul

20  University.  I have come to this conclusion with the help of a professional therapist and social

21  worker...the aforementioned circumstances ...have been determined to be detrimental to my

22

23

24                                                              17

emotional well-being...".  This situation caused a loss of income for Robbins, a full –time student and single mother.

**6) In 2010, Robbins' white classmate, Dianna Demski shouted profanities at Robbins during a conference in front of their tutor in the DePaul Writing Center. Their Professor Miriam Ben-Yoseph did not enforce disciplinary action against Demski per DePaul policy.**

On March 13, 2010 Robbins contacted Professor Ben-Yoseph regarding a classmate Dianna Demski, a white student, who shouted profanities at Robbins during a conference with their writing tutor in the DePaul Writing Center. Ben –Yoseph emailed Robbins a note saying that she did not want to get involved. However, Robbins consistently complained that she felt uncomfortable with Demski who was her teammate on a class-group-project. Ben-Yoseph conceded by arranging a private meeting between the two students; however, Ben-Yoseph allowed Demski to opt-out. Only Robbins attend the meeting with Ben-Yoseph. The professor only wanted the name of the DePaul tutor so she could apologize for Demski' behavior.

Robbins felt Demski cursed her because she is African American.  And that Demski came to the meeting with the intention of mocking Robbins.  During a previous class presentation, Demski said she worked in financial service as a stockbroker and she dressed and spoke accordingly.

However, Demski arrived to the private touring session with Robbins late, dressed in a bandana and raggedy jeans.  She greeted in Robbins as "dude"  saying she was late because she got

18

laid off, her cable service got turned off, her cat was sick, and she waited on a bus for so long that never came, and then she took a cab and it broke down. Robbins ignored her, and proceeded to discuss the paper she had prepared for critique by the tutor. Demski did not produce a paper as she agreed, but brought a graphic chart instead of prose for review by the writing tutor. Robbins told Demski that she did not understand the chart and asked for her paper. Demski got upset and loudly started shouting profanities at Robbins in front of the tutor and other students in the center. The tutor seemed to empathize with Demski and asked Robbins to look at things from Demski' perspective, and try to finish the session, and other research they had planned to do in the DePaul library.

In addition, Robbins concluded from the incident with Demski and Ben-Yoseph' failure to file a formal complaint as required in the DePaul Student Handbook the following 1) that the incident was intended to mock Robbins who Demski viewed as a Black woman whose was down-and-out 2) Robbins believed that disciplinary action was withheld because Demski was observing Robbins as part of a human subject research project, without her permission, and despite of her discomfort with Demski behavior 3) Robbins wrote a paper on a woman down-and-out and recently turned it in to Professor Ben-Yoseph. Robbins feared she had shared her paper it with Demski. As a result of these incidents, Robbins felt jarred, loss focus on her school work, and never returned to the DePaul writing center for tutoring help because she felt humiliated, she feared this type of incident would happen again, and that she would not have any recourse or support from the School of New Learning officials.

Robbins was forced to continue working on the team project with Demski after the incident because it was too late to withdraw from the class without receiving an F grade and loosing scholarships and financial aid; however, she felt that the class was a hostile environment . Robbins

19

isolated herself from the team and successfully complete the course and all assignments with the exception of a one page self-assessment questionnaire worth 10% of the total grade .

However, Professor Ben-Yoseph contacted Robbins after the term ended requesting a one (1) page self-assessment questionnaire worth only 10% of her total grade. Robbins informed her of a death in the family, the course was over, and she was not in state-of-mind to do any further work. Robbins told Ben Yoseph that she would accept a grade based on the 90% of work she did complete. However, Ben Yoseph issued Robbins a grade of Incomplete, without informing her, and without the required student consent form, and signed Incomplete Contract agreement between the student and teacher.

When Robbins discovered that she had not passed the class she contacted Ben Yoseph to reiterate that she would not complete the self-assessment questionnaire, and after searching for it discovered that Ben Yoseph had never issued the document to Robbins. Ben Yoseph changed the grade to B+ two weeks after final grades were due and a permanent notation of the Incomplete grade remains on Robbins unofficial transcripts today.

Robbins wrote to Associate Dean Susan Reed and Student Advocate Mary Dix to have the Incomplete comments removed from her transcripts because Robbins believed she earned the B+ and she should not have to explain to potential employers or grad school officials why the grade had to be changed. Dix wrote to Reed " Miriam (Ben-Yoseph) ....information is very different that what the student relates. Miriam said the student did not complete the last assignment....and giving her an opportunity to turn it in....The student did so and Miriam change the grade reflecting that assignment". Reed also reiterated to Robbins that she did indeed complete the last self-assessment form and turned it into Ben-Yoseph and the grade got change. However, Reed, Dix, or Ben-Yoseph

produced the finished self-assessment by Robbins.  Robbins felt that Ben-Yoseph issued Robbins an Incomplete grade in retaliation for reporting Demski harassment of her.  And lied to School of New Learning administrators to justify issuing a faulty grade to Robbins instead of the B+ grade she earned. The incomplete comment still remain on Robbins unofficial transcripts which she shows to the public.

Demski continued to make unsolicited contact with Robbins through social media until May of 2012 two years after this incident.  On December 15, 2010 Robbins reported to the Dean of Students at DePaul, Art Munin  that Diana Demski kept contacting her long after the class ended and that Robbins desired for her to stop.  Munin responded that he could not hold Demski accountable.

**7) Matthew Sorenson, Professor, School of New Learn, DePaul University, Chicago, IL declined to give Robbins meaningful feedback on her assignments that could have improved her grade until after the course ended.**

In April 2010 of the Spring quarter, Robbins contacted Professor Matthew Sorenson several times requesting clarification on his instructions for a key class project in his online science course , The Creative Brain Science.  Robbins requested information about an important project, specifically she asked Professor Sorenson to clarify his instruction to the students to contrast and compare theories as it related to her topic , as well as more details about directives in the course syllabus. Robbins posted her questions for Sorenson online in the discussion board area reserved for student inquires about assignments.

However, Sorenson did not respond to Robbins request, so she posted a second online inquiry, but Sorenson did not reply.  Finally, Robbins sent the request for this information to

Sorenson via email. Sorenson responded with a short dictionary definition of the word "compare" and a brief dictionary description of the word "contrast", along with another copy of the syllabus . Sorenson declined to include any clarifications or feedback that would have helped Robbins complete her project in accordance with his expectations. And he did not address any of her questions regarding the course syllabus.

On June 19, 2010 weeks after the class ended, Sorenson gave Robbins the feedback that she requested early in the term and prior to completing in his end of the quarter course assessment as follows:

STUDENT'S GENERAL PERFORMANCE: (written by Matthew Sorenson regarding student Barbara Robbins)

(Please write a statement about the student's work in the course)

"Barbara, The A3G competence provided an overview of the two theoretical approaches, but there was little information in terms of examining the differences between the two (contrast). The presentation should have gone further in terms of discussing the similarities and differences. The approach of examining racism in relationship to cognitive function was also intriguing, but could also have been extended a bit further. Racism is implied in the context of life stress, but then as a environmental/cultural limiting factor ".

Robbins contends that Sorenson deliberately withheld valuable information form Robbins, which definitely would have helped her better understand the learning objectives of the course, apply them to her work, author papers and projects that would have earned Robbins a higher grade than B, and boosted her GPA by several points. This would have been attractive to employers and

graduate schools that Robbins pursued.  In fact, for the entire duration of the class Sorenson did not make a single comment on any of Robbins assignments other than providing feedback that would offer clarification to other students who commented on Robbins paper on the effects of racism on the brain.

Lastly, Robbins asserts that Sorenson discriminated against her because of her African American heritage and because she presented a topic on racism in his online class.  Sorenson lack of direction and guidance forced Robbins to work much harder than other students (who got plenty of feedback from Sorenson) to try and understand his expectations for the course; and caused Robbins to underperform because of lack of guidance from Sorenson, undue stress, and physical harm.

10)  In 2010, Robbins told Professor Matthew Sorenson that her team leader Tonya Beall moved the team discussion board in his online course. Beall created a new discussion board without notifying Robbins, which barred Robbins from participating with the team. Sorenson informed Robbins that Beall's actions were "allowable ".

In March 2010, Robbins contacted Professor Sorenson to inform him that her team leader Tonya Beall moved the team's online class workstation for the course site without notifying Robbins.  Beall created a new discussion board for herself and the other team members to submit work on and discuss their team project.  Beall and the team completed the team project on Bipolar disorder without Robbins and exchanged personal email information with each other to chat offline and send course documents between them and isolate Robbins.  In the meantime, members of the

team continued to post discussion comments about the team's progress in the original discussion thread, so that Robbins would not suspect that they had moved on and completed 98% of the project without her. After completing the work, the team complained that Robbins was not participating in the class. When Robbins noticed that Beall had created a new team discussion board, she notified Sorenson.

Sorenson told Robbins that Beall's actions were "allowable". Robbins argues that Sorenson turned his back on obvious misconduct led by Beall. He refused to acknowledge her negative comments toward Robbins at times saying in an email, "I did not see them". In addition, Sorenson did not admonish any disciplinary action against Beall. Robbins believes that Sorenson's and Beall's actions created a hostile learning environment for her, denied her access to class materials and discussions, and were prompted and approved by Sorenson because of Robbins race and her selection of a controversial topic about race that submitted o before the class for open discussion in the Creative Brain online course.

Tonya Beall continued to harass Robbins through social media six months after the class ended. Robbins reported these incidents to DePaul's Assistant Dean of Students, Art Munin. She stress that the emails were unwelcome. However, Munin said that emails were from a business and not Beall. Robbins sent him a screen shot of a Facebook invitation to Robbins from Beall. But Munin said he could not hold the student accountable because she no longer attended DePaul. Robbins asserts that Beall was a current student still in attendance at DePaul and listed in the Student Directory as active. Robbins asserts that Beall felt free to harass Robbins with unsolicited contact because Sorenson and DePaul officials were unresponsive to concerns.

**13) In 2010, Robbins' Academic Advisor, Fred Wellisch told her that he would not approve her Advanced Project Proposal even though Robbins met all of the academic requirements to move forward with it. Wellisch informed Robbins that she had to complete ten reports, which were not required perquisites for the Advanced Project Course.**

On August 26, 2010, Robbins contacted her Academic Advisor with a proposal for my Advanced Project. Mr. Wellisch informed Robbins that he would not approve it even though she met all of the academic qualifications. Robbins successfully completed the required perquisite course work, and presented Wellisch with a properly executed and substantive Advance Project Proposal on the following topic: The High Employment Rates Among African American Youth, Ages 16-24, in the City of Chicago, institutional racism, and the causes of chronic unemployment for African American youth compared to their White and Hispanic counterparts.

However Wellisch wrote to Robbins upon receipt of her proposal saying : "This is detailed, thoughtful and certainly seems to fit what SNL envisions as an AP..." However, Wellisch denied Robbins Advanced Project Proposal saying "I will neither discuss nor sign off on this proposal until the focus area write-up are approved ( a process that could take up to ten weeks). Robbins responded "The only prerequisite listed for advanced project is the completion of Research Seminar. I have successfully completed that course, and therefore, am eligible to take the Advanced Project Course. Additionally, a meeting with an advisor .. P. A. is not a prerequisite....".

Wellisch insisted that he would not approve Robbins AP saying on August 26, 2010:

25

"You are certainly correct that the only pre-requisite to registering for AP (Advanced Project) is RS (Research Seminar)".

Robbins further noted that according to Wellisch requirements to complete the focus group write-ups were *not* listed in the course requirements, Student Criteria for Advanced Project Qualifications, Student Handbook, School of New Learning website, Foundations for Adult Learning Handbook, or in any known DePaul policy.

Furthermore, Wellisch had told Robbins 18 months earlier at her First Committee Meeting that needed the focus area write-ups, but did not give her deadline or due date by which she had to complete the write-ups. Nor did Wellisch make the write ups a condition for the Advanced Project, during the first meeting with her Professional Advisor, Doris Palmer present. Wellisch did not contact Robbins or Palmer these requirements in writing ,or send Robbins notice and warnings that she had not completed them, and needed to do so because the next step in her degree program was writing the, all important, Advanced Project (similar to a Capstone Project) . Robbins offered to complete the focus group write-ups prior to graduation, as it is required to graduate, but not need to qualify for Advanced project. However, Wellisch declined her request.

Robbins believes that Wellisch neglected to provide any academic guidance her for 18 months, he only sent Robbins two communications over that time period: one in regards to his vacation and the several others regarding his failure to follow through with the necessary paperwork for her classes. Additionally, Wellisch intentionally stopped Robbins Advanced Project because she intended to write about hot topics about injustices toward Chicago's African Youth and institutional racism in Chicago. And Robbins asserts that Wellisch waited until Robbins reached the Advanced Project level in her degree program to further retaliate against her knowing fully, as the Director of

Advising ,that the School of New Learning did not have an established policy that supported his delay of Robbins Advanced Project.  This admonishment towards Robbins forced her to push back her graduation date, and she spent most of the Autumn 2010 quarter writing focus group write-ups about the Cost Accounting, Business Etiquette and other classes that she transferred into DePaul from other colleges.

After Robbins complete the write-ups it took weeks to get final approved causing her to lose $3,000 she paid for the Advance Project course.  Robbins requested for a refund but was denied and Robbins got an Incomplete grade for her Advanced Project.  This delay in her degree program also cause Robbins emotional trauma and devastation.  Due to the Incomplete Robbins' work load for the Winter Quarter 2011 and beyond became far heavier than expected because she had to finish the remaining classes in her degree program along with this major project.

**14) In 2010 , DePaul's Assistant Vice President of Diversity, Barbara Schaffer failed  to advise Robbins on how to file a complaint with the her office regarding allegations of racial discrimination  that Robbins reported to DePaul's President.  Schaffer diminished Robbins discrimination complaints to dislike of her and aborted her promise to follow-up with Robbins, saying, "Sorry I didn't call, something came up" and scheduled another meeting with Robbins that went nowhere.**

On August 26, 2010 Robbins sent her second  letter to the President of DePaul, Father Holtschneider, regarding racial discrimination towards her and added " This time it is in regards to the backlash and retaliation.  As you know malicious gossip spreads and infects, otherwise good people.  Over the past year, I have been the target of this kind of retribution for instructors in the

School of New Learning...." Holtschneider requested Jose Padilla at DePaul to do the following: "
Can someone on your team draft an appropriate response for me? There's obviously a long history
her, but I'm afraid I don't know it".   On August 28, 2010, Barbara Schaffer, Assistant Vice
President for Diversity at DePaul contacted Robbins stating " I am ... the person responsible for
looking into allegations of harassment and discrimination at DePaul" .

      Schaffer had prior knowledge of Robbins complaint of discrimination in the Department of
Education.  Just a few days prior, Schaffer responded to an email from Donna Washington in DePaul
Human Resources Department. Washington asked " Who is Barbara Robbins". Schaffer responded "
I found two files on Robbins....I will have Emily send them to you".

      Shaffer called Robbins over the weekend of August 28, 210 and explained the types of
discrimination that DePaul investigates.  Robbins explained the situation with Wellisch and the
cancellation of her Advanced Project, which she believed, was due to racial discrimination in regards
to the topic of her project, and retaliation for reporting him to the Dean.   However, Schaffer told
Robbins that she did not believe that Wellisch was racist towards her, but rather Wellisch " he just
does not like you" however, she failed to provide a reason for the "dislike".

      Shaffer asked Robbins if she still had the paper that Wellisch suggested she plagiarized, and
mentioned that her husband was an attorney. Schaffer promised to give Robbins her home phone
number so, that  Robbins could ponder on the "zillion examples of racism"  that she mentioned in
her letter to Holtschneider, and  talk on Sunday.

However, Schaffer did not give Robbins her home phone number. Instead, Schaffer set a time to talk on Tuesday, August 31, 2010.  But Schaffer did not call Robbins at the mid- afternoon appointment time.  Robbins called and email Schaffer asking what happened?  Schaffer responded to Robbins later the evening of August 31, 2010 at 6:09 PM, by email saying " Sorry I didn't call today; something came up...".  She arranged for another meeting, but it didn't go anywhere.  Schaffer only suggested that Robbins "get another advisor".

Robbins contends that Schaffer had full knowledge of the harassment that she endured at DePaul. However, she did nothing about Robbins complaint about Wellisch and her blacklist status in the School of New Learning. That Shaffer forgot about meeting with Robbins, and did not follow DePaul's Harassment policy by opening a formal investigation , informing  Robbins of her right to file a complaint with ODIE, following up in writing  or establishing preventive measures relative to Robbins.  Rather Shaffer intentionally distanced herself from Robbins by essentially yawning at her racial discrimination charges, she diminish the accusations, and acted dismissive towards Robbins.

Additionally Schaffer told and her representatives, the U.S. Dept of Ed Office of Civil Rights (OCR) investigators per written statements from the OCR **(Docket #05-11-2209)** that  Shaffer " the contact person at OIDE called the Complainant (Robbins) the next day (after Holtschneider got Robbins letter) to schedule a time to address the Complainant's allegations, but the Complaint did not schedule an appointment with the OIDE(Schaffer) or file a complaint with the OIDE.

Robbins did contact the Dean of the School of New Learning and request that Wellisch be removed as her Academic Advisor.  On September 16, 2010, Associate Susan Reed emailed

Wellisch writing "As promised.....I considered Barbara Robbins as a "case study" and came to the conclusion that we would reassign her..... I know you're not heartbroken.". Wellisch responded " Don't worry . Far from it. .."

**Robbins argues that given the lethargic response by DePaul to Robbins discrimination and harassment complaints that she was targeted for further discrimination when:**

**1.** Curiously, shortly after Robbins encounter with Barbara Shaffer in DePaul's Office of Diversity. In September 2010, Professor Howard Jeffery, Robbins Service Externship instructor subjected her to a credit check by assigning her to a small non-profit organization, which required that Robbins, an unpaid student-volunteer, submit to a massive back ground check. Jeffery did not give Robbins prior notification of these unusual course qualifications.

Robbins inquired with the other students and none were asked to divulge their credit history, submit to national and state employment investigations; however , students working with children *may* have underwent criminal background checks *only* . In addition, according to the class syllabus students selected the organization they wanted to serve. But Howard suddenly removed the option and placed Robbins at an organization that received partial funding from DePaul.

On Sept 9, 2010, Professor Howard Jeffery, subjected Robbins to a "Surfacing Paradigms" exercise that required Robbins to give her reaction to a racial slur: "Welfare Queen".

In October thru November 2010, Professor Howard Jeffery subjected Robbins to racially explicit comments by her online classmates, which included but were not limited to "... a recruiter .... said my score was good but that ... I was a white male and they had enough of those and joked it was a shame I wasn't a black woman as I'd be a shoe in and require a significantly lower score on my entrance exam...."

In November 2010, Professor Howard Jeffery emailed Robbins twice from his phone and asking if Robbins fully understood the merits of "white privilege" per an article he assigned the on the topic . These overtly racist comments caused Robbins to lose her focus and the quality of work began to deteriorate. By the end of the term Robbins did not have the mental wherewithal to complete her final paper with clarity. Jeffery emailed her regarding the Final paper lacked coherence saying, "I could not understand it".

Robbins classmate Jamal Anderson, identified himself as an African American male, a former student at Clark for four years, a Historically Black College, in Atlanta on his online profile with a blank photo of himself. Jamal made a suspiciously high number of claims of being discriminated against. He mocked African Americans through buffoon-styled dramatic stories that he posted to class discussion thread throughout the duration of the course.

For example, on September 13, 2010 Anderson introduced himself to the class with this online post: "I...am very happy, despite the blatant racism at every turn. I also love dancing and the Lord Jesus Christ...".

However, after the course ended, Robbins received an communication about the students in the class with a photo showing Jamal D. Anderson clearly as a man of Middle Eastern dissent. Robbins could not find a Jamal D. Anderson listed in the DePaul Student directory or any other reference that linked Jamal D. Anderson, an African American male to DePaul despite Anderson's claim of being a student in the School of New Learning for over 10 years.

As a result of this class experience, Robbins began seeking the help of a second professional psychologist and worked with them to learn mental strategies that would her withstand the harassment at DePaul. The psychologist drew a map for Robbins, telling her that thoughts,

31

conversations, words relevant to the harassing events at DePaul had to stay above a certain threshold in her mind. And If she allowed herself to reflect on these incidents, in fact, she was experiencing the harassment over and over describing it as "like replaying a movie" which subjected her to emotional and physical harm, as Robbins had gained over 50 lbs since attending DePaul.

The psychologist urged Robbins to practice finding comfort in knowing that she had filed complaints of harassment with the proper authorities and to depend on her faith in God to resolve these situations that plagued her. Therefore, Robbins only reported to the credit check requirements to the Assistant Director of Academic Development, Jean Vipond and did not discuss the other occurrences during the class ,which Robbins viewed to be racial harassment and retaliation with anyone.

**In 2011, Associate Dean, Susan Reed did not notify Robbins of the cancellation of a course on Slavery that Robbins enrolled in even though Reed knew the course would not be offered.**

3) According to the OCR determination of Robbins " Complainant also alleged that a class on Slavery was cancelled in retaliation for her previous complaints of discrimination and based on her race. " And Robbins noticed that this was the second cancellation of her courses within a few weeks, and unusual occurrence.

1   DePaul told the OCR investigators: " the Slavery class was cancelled because the Instructor

2   assigned to teach the class was on leave for the Winter quarter and no appropriate substitute

3   instructor was available.  The Dean explained that the University inadvertently forgot to remove the

4   course from the catalogue before it was published".

5       However, in an email to Elva Galindo of DePaul, on January 5, 2011, Galindo told Associate

6   Dean, Susan Reed that she did know that the Slavery course was in the catalogue, and Reed told

7   Galindo to leave it in anyway , Galindo wrote to Reed  saying " In late November I inquired with

8   you about....FDIS (see attached email) and indicated that I had her (Davis the instructor on leave)

9   scheduled in Winter and whether or not I should schedule her for the remainder of the year, and you

10  said to go ahead and schedule her but not for Summer ll ?.." And apparently Reed had a class roster

11  at her disposal sent by Galindo that showed Robbins registered as a student in the Slavery course.

12      Robbins contends that the Dean lied to OCR investigators and left the course in the catalog

13  knowing that Robbins would be frustrated, and have to scramble to replace the course with little or

14  no options available (because the other options had been cancelled) for such a specialized course,

15  which Robbins needed to graduate in order the upcoming quarter.  And that Robbins would possibly

16  loose financial aide monies.

17      In fact that is exactly what happened the next quarter, In Jan, 2011  Robbins new advisor,

18  Gretchen Wilbur made note of this when asked why Robbins was opting to take audited classes that

19  she would not get credit for so close to her graduation date.  Wilbur responded via email on that she

20  thought Robbins need to take this desperate measures because " Her choice may be related to

21  garnering the full amount of financial aid".  In addition, because of the cancelled Slavery class

22

23

24                                          33

Robbins had to opt for a Guide Study, which is a type of self-help course. The student is assigned an instructor only for occasional guidance for a singular project that the student submits to show competence in the subject matter. Robbins had to take two (2) Guided Studies courses and complete the work for both in six weeks vs. eight to twelve weeks that other student had to complete their assignments. If Robbins did not complete the work and opt for an incomplete her financial aide funding would have been subject to termination. Robbins contends that she was forced into this pecarous situation through no fault of her own, but because of retaliation by administrators in the School of New Learning for her repeated complaints of racial discrimination .

4) In 2011, Professor Eric Thor ignored Robbins written request for an incomplete grade in his math course because of Robbins visual impairment. Thor waited until after the quarter ended, and and he had issued and F grade to Robbins before he responded to her request, which was no.

5) In 2011, Robbins reported to her new academic advisor, Gretchen Wilbur about numerous "administrative errors" on her academic transcript, which caused her GPA to drop from 3.3 to 3.0. to 2.66. Robbins asked Wilbur to recalculate her GPA. However, Wilbur gave Robbins instructions on how to do it herself that were incomplete or vague, even though, she emailed Associate Dean Reed about GPA calculations saying "...I'm so proud... I know how to do it...".

Between March and June, 2011 Robbins contacted Associate Dean Reed and an Assisant to DePaul President Holtschneider' Ashley Perzyna who monitored Holtschneider emails regarding a pattern of egregious errors and negative comments on her transcripts.

Robbins asked Perzyna to help her resolve the issues because was given the run around by School of New Learning officials on this issues. Perzyna contacted Associate Dean, Susan Reed to look into the problem. Reed told Robbins that" errors that included missing grades, grades issued without the instructor grading Robbins work, grades issue before she complete the class, and finally a C grade given by instructor Eduardo Bascaran, before Robbins all of the assignments, or further instructions, prior to the incomplete term expiring " would remain on her unofficial transcript .

A high level DePaul official Caryn Chaden, asked Reed if she had changed the "C" grade, however, Reed to her " it looks to me like an administrative problem" to which Chaden responded: "I have to say that, on this one, I don't blame her for pressing to see this resolved".

However, Reed and Perzyna did nothing until July, 2011 when Robbins then a former student again requested that her GPA be adjusted. Perzyna contacted Reed and saying she had stepped away from the problem with Robbins because she thought Reed was taking care it. Reed responded by email "Barbara is back" and contacted Robbins telling her GPA was 3.2 and not 2.66.

Robbins contends that the errors on her transcripts caused her GPA to drop to a level that did not reflect her work and one that would be frowned upon by potential employers and graduate schools. And that because of this she did not apply for employment or grad schools because she was ashamed of the incorrect GPA (see list below).

a) In 2010, Professor Catherine Zurybida, Robbins art instructor, failed to grade nearly a quarter of Robbins assignments, and Zurybida did not read any of Robbins final papers before issuing a B- grade for the course

b) In April 2011, Professor Eduardo Bascaran, Robbins' marketing instructor issued a grade of C to Robbins before she completed the course assignments in accordance with Bascaran's instructions. The C grade caused a significant drop in Robbins GPA.

d) In June 2011, Professor Erick Peterson , Robbins' mass communications instructor reduced her grade in half on an assignment because she did not raise her hand properly, or place a check mark  in a box correctly during an online practice session.

e) In 2011, Professor David Klossy, Robbins' business writing instructor, subjected her to graphics during his class presentation that only mocked or celebrated the death of African-American leaders , specifically,  President Obama  and Dr.  Martin Luther King, Jr.

**In July 2012, Suzi Wachowski, Associate Student Records violated FERPA rules by refusing to honor  Robbins written request to review her academic records and other documents. In addition, DePaul blocked Robbins 2012 financial aid records making them unavailable for her to view.**

The President's Assistant, Ashley Perzyna was aware of Robbins request to view her academic , financial, and all other records on July 13, 2012 Karen LeVeque in the Student Records/Financial Aide deparment wrote Perzyna: "She also would like copies of all her DePaul

records that are not accessible on Campus Connection. I asked her to make that request in writing so that we can go through whatever the appropriate channels are for FERPA request of this type".

However, DePaul did not respond to Robbins written request. Robbins contacted the U.S. Department of Ed. Office of Civil Rights and asked them to investigate this violation ;however, the request was denied.


**Conclusion**

Due to racial discrimination and retaliation by DePaul University Barbara Robbins was forced to withdraw in June, 2011 shortly before her graduation without receiving her BA degree. In addition Robbins suffered emotional damage and was diagnosed by Psychiatrist and Medical Doctor, Carl A. Bell to have and Adjustment Disorder brought on by this harassment. As well, Robbins gained over 70 lbs and escalated hypertension due to the stress brought by her situation at DePaul and loss income when she was forced to quit her student-work-study position. Robbins is seeking financial restitution of $750,000 as recovery to finish her degree program at another university, and recover income that she could have earned with a BA degree had she received it in 2011-12 as scheduled, and subsequent Master degree which she anticipated having received by 2013, and for her emotional distress.

Barbara Robbins
332 S. Michigan Ave
#1032 R-615
Chicago, IL 60604
312-545-8789

37